The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Be seated, please. Good morning and welcome to the Fourth Circuit. We're certainly getting our money's worth today on the heating, but we're in a government building so it is what it is. So we'll hear argument in our first case, Kritter v. Mooring, and we'll kind of gauge the temperature as we go through the morning and see if we have to take some breaks. So with that said, Mr. Chilson, we'll hear from you. May it please the Court, good morning. My name is John Chilson, along with Tom Comerford. I represent Kritter Cropdusting and the estate of Eugene Kritter in this premises liability negligence case in which we allege, and the defendants all agree, they failed to exercise due care in keeping an invited lawful visitor to their premises safe from a booby trap hazard. The issue before the Court, they, the record is clear that, and specifically I'm referring to deposition testimony by the defendants, they did not do an investigation for hazards. But the point is you can't say they conceded, right? I mean, you weaken your own argument when you overstate your story, right? You may say that they conceded facts that show the following, but you begin your argument by saying they've conceded that they violated the duty of care. If they conceded that, we would not have a dispute here. Well, Your Honor, what they say is that they did not have a duty, but their conduct, they've conceded their conduct is really what I meant. The question is whether that conduct left any genuine material disputed facts on the question of whether there was a foreseeable duty on the part of the defendants. Yes, that's true, Your Honor. Why don't you tell us why that is? Sure, we contend that there were a number of places in which the district court, the trial court, weighed the evidence and decided in favor of the moving party, the defendants in this case. I'll get into specifics and I can keep going, but the first one is Nutrien's duty. The court said that they had not engaged in an undertaking, that imposing liability was unwarranted on them, and that investigating and warning of hazards exceeded their scope of their calling. Let me ask you this, if the Dawd defendants are not liable here, is Nutrien liable? Yes, Your Honor. Nutrien is liable because they are a large international chemical sales company in which part of the… Right, but they have to, under your theory as I understand it, Nutrien would have to have taken on an independent duty separate and apart from the Dawd defendants, which could imply that the Dawd defendants didn't have a duty. Well, Your Honor, we contend that they both have duties, they're separate duties. I understand that you make that claim, but you can see the contradiction there. I can see the contradiction, Your Honor, because they both had very different roles in this case. The record is clear that Nutrien, as part of its business model, provides for the application of the chemicals that it sells to its customers. There are two non-party pilots in this case who have been deposed, Richard Wheeler and Dick Froman, and they both testified very clearly that they often spray for Nutrien and that they expect Nutrien sales reps, who they usually meet, they say, instead of the landowner, to advise them of hazards on the properties. So is there a place in the record that we can find where there's a contractual undertaking by Nutrien and what the terms of that contract are? What were they obligated to do? Where do we find that in the record? So there is not a written contract. Instead, it's an implied understanding that goes along with the industry standards. And so there are numerous places in the record where there are references by pilots. Is there a contract for the chemicals in the record? No, Your Honor. Was there a contract for the chemicals? There was a sales receipt, yes. But there is testimony by Rodney Thomas, who is the only crop dusting expert in this case, on pages 2066 and 2067 of the joint appendix, that it is an industry standard for a crop consultant like Jordan Elmore to inform the pilot about hazards such as this cable. This cable was not something that a pilot is trained to see. The record shows that pilots are trained to look for multiple poles because that is from which wires will extend. This was a single pole. It was a booby trap hazard that was installed by one of the defendants. In my mind, that leads to a central question that I'm not sure the parties or the district court particularly addressed. So I think the defendants would agree that they could certainly see this wire from the ground. And so would anybody else who was walking on the land. What made it reasonably foreseeable to them that the wire they saw would not be just as visible from the air? Well, we contend that the law requires a landowner or occupier to investigate their premises to make sure that it's safe for lawful visitors from hidden dangers. In this case, as I said earlier, there is no evidence that any of the defendants exercised any due care to investigate the property. The reason for that rule, the reason the law requires an investigation by a landowner or occupier, is because... So in response, I'm not sure you're answering this question, but you think they needed to get in a helicopter and go look to see whether the wire was visible from the air? No, Your Honor. The landowners are the experts of their own property. They are the experts of what is on their property. They had access to the property. Nutrien, through Mr. Elmore, in addition to the... Maybe I'm wrong, but can you try to answer his question? I'll rephrase it for you. So the landowners... I just thought it was a good question, so I want to get your take on it. The landowners look and they can see the wire, right? We know they can see the wire from the ground. The question is, why is it foreseeable to them that it's not just as visible from the air? Why would a farmer be like, I see the wire, right? There's a pole, there's a wire. Why would they then think... I understand why they might understand it's a danger. But why would they think, well, a pilot's not going to be able to see the thing that I can see? Because if they inspect, as they're required to do, then they view the obstacle. They don't need to inspect it, right? They see it. I mean, they're looking at the thing. Well, they would view the obstacle in the context of what the lawful visitor is there to do. In this case, if they looked at the wire in preparation for Mr. Critter's arrival from the ground, they knew from previous experience with crop dusters at which height they fly over the cornfield. They would have also then looked and said, oh, that wire, which we knew about, that wire is about the same height above the corn as a crop duster will fly. Mr. Chilson, is this issue of foreseeability a question of law for the judge or a question of fact for the jury? Your Honor, in this case, there are so many material facts that it is a question of fact for the jury. And is it part of the duty of care or is it part of causation? It could be both, depending on how you read the cases. Under North Carolina law? It's duty. The issue of foreseeability under North Carolina, is it part of the duty of care? Well, in order for the duty to exist, the hazard has to be reasonably foreseeable, meaning they knew or should have known, which is one thing that we contend was missed in the district court's opinion. Whether or not a jury, with looking at all the facts presented, would determine not just that they knew, but that they should have known had they performed this investigation. In that case, they would have a duty. So you're suggesting that duty of care is a mixed question? Yes, I do. Yes, Your Honor. So there are, Judge Agee, there are a number of other places in the record where there are mixed questions of fact, where the court concluded as a matter of law. What's your best evidence to create a disputed issue of material fact that the defendants knew that this wire would be a hazard from the air? We contend that a jury could determine that they should have known that it was a hazard from the air because they installed the wire in one of the defendant's cases. They knew that the wire was present. They all had familiarity over many years, and including with this crop duster, in observing crop dusting operations. Mr. Elmore recognized that there is no difference between a helicopter crop duster and a fixed-wing crop duster. They both fly low over the fields to apply the chemicals. That is exactly where this wire was located. It was something that was there. The deer stand was there, too. What would have happened if the decedent had flown into the deer stand? Then he, we recognize that the pole itself was a hazard. And the pilot, Mr. Critter, saw the hazard, according to the record. So if he had flown into it, then I believe that he would have been contributorial and negligent. Same thing if he'd hit the pole? The pole, yes, Your Honor. So it's not uncommon for poles, particularly in rural areas, to have wires strung from them. Why would it have been reasonably foreseeable to the defendants that that would not be common knowledge? Your Honor, the reason is because this is a unique setup. This is not a situation where there are two poles from which a pilot would expect a wire to be hanging. It's not a situation... I mean, you've been, have you ever been in a dove field? I have been in this field, yes, Your Honor. I mean, you sit in lots of dove fields that are not electrical wires, right? They have a pole and they run a wire because the doves like to sit on it, right, before they come into the field to eat. That's not, like, terribly uncommon. I mean, you say this is uncommon. I happen to sit in several that look a lot like this. And so that's a... Now, maybe I take that might be a fact question and you might just lose before a reasonable jury that's familiar with dove fields. But to say it's unique seems, like, mistaken here, right? Well, Your Honor, with all due respect, this wire extended from a pole where there was a deer stand ladder across the top of a field into a woods of mature trees, which was on the eastern side of the field where it was connected to a mature tree. So the evidence is that Mr. Critter did not see the tree. So, in other words, he had no reason to believe that there was anything other than a deer stand attached to this pole. Your argument is if there were two poles in a field, then he would have been on notice. And maybe this is... We're probably talking about jury questions mostly. But in that instance, any reasonable pilot would understand when you've got two poles, there's likely a wire. But your view is that no reasonable pilot would see one pole in the middle of a field and think that the wire was tied off to something other than a telephone pole. That's right, Your Honor. And that's what all of the crop duster pilots who testified in the case have said in their testimony, which is there would have been no reason for a crop duster exercising reasonable judgment to look at that individual pole and see that ladder there and think that it's anything other than a deer stand. Oh, no, I've been in an awful lot of deer stands over time. I've never been in one with a telephone pole attached, but that's neither here nor there. So let me ask you, going back to the Nutrien and Elmore defendants, is the material dispute a fact here in your view that the terms of their engagement are in dispute what they undertook to do? Your Honor, the evidence in the record suggests that it's very common for Nutrien and its competitors to provide a service along with the sale of its chemicals, whether it's aerial application or ground application. Mr. Elmore testified himself that 20 percent of his customers use aerial application. Mr. Wheeler, who's flied over this field in 2019, was connected to this field because it had been flying at another field for Nutrien. The two pilots who are not parties to this case and plaintiff's expert crop dusting pilot, Mr. Thomas, all testified that it is common for them to meet with a Nutrien rep, as opposed to a farmer, who they understand represents not only the farm, but is speaking for the farm. That person, by industry custom, advises them of hazards in the fields. That's what their testimony is. It's that part of the custom is that Nutrien provides a service through their employee, Mr. Elmore, and when they do that, they're expected to exercise due care because they have engaged in an undertaking. So that's your proffered evidence. They say, no, we didn't agree to do that. All we were going to do is deliver some chemicals, and there's the factual dispute. Yes, Your Honor. Okay. That's right. So, Your Honor, I see I have 18 seconds to go. Would you like me to continue or have a seat? That's up to you. You do what you want. Okay. Thank you, Your Honor. I'll sit, and I have reserved five minutes for rebuttal. Thank you. All right. Thank you very much. We'll now hear from Mr. Brock. Yes, Your Honor. Good morning. Walter Brock from the Wake County North Carolina Bar. I will be arguing on behalf of the farmer defendants, and my colleague, Mr. Hogan, will be arguing on behalf of Nutrien and Mr. Elmore. We submit, Your Honor, that there are two reasons why the district court should be affirmed. They're two sides of the same coin. The first side is there's no duty of these farmers to warn of what turns out to be a very unique aeronautical hazard. The farmers had no way of knowing that that presented an aeronautical hazard. Secondly, we believe that the evidence establishes that the plaintiff, Mr. Critter, was contributory negligent as a matter of law for reasons that were not directly addressed by the district court. We also submit there really aren't any facts to resolve. The district court, if I remember, found that the contributory negligence was not present in this case. At least in summary judgment. What he concluded was that because there was evidence in the record that the wires were hard to see from the air, and that's an issue of fact, we submit that that was the wrong focus on the contributory negligence issue. We submit that the focus on the contributory negligence issue is that the pilot was aware of the hazard of the pole, a 32-foot pole in the field. That's not a pole for a deer stand, we all know that. The deer stand, the record shows, was 10 feet high. So take that if I was on a jury, I'd be a pretty good one for you. Help me understand why these aren't just jury arguments, right? I totally get your argument. If you see a pole in the middle of the field, a reasonable person would believe that that pole was there for a reason other than the deer stand, that there would be a wire going somewhere. I totally get that. But, you know, there's an argument on the other side that that's not what a reasonable person would do. And, you know, people could sort of disagree about that. I totally get your jury argument, but help me understand why that's a summary judgment argument. It's a summary judgment argument, Your Honor, because of what this court put their fingers on is the unique nature of this hazard. The farmers knew there was a 32-foot pole in the field, and they knew there was a dove wire there. Under North Carolina law, you have a duty to warn only of hidden or concealed dangers. So the examination of the evidence should be, I submit. But there's some evidence, right? There's evidence that the wire was not visible, you know, and they put in evidence of the drone that was flying around or whatever we want to say about the evidence. But there was evidence, right? And the question is, what does the jury believe? That makes my point, Your Honor. The fact that they had to engage expert witnesses and drone footage to demonstrate that from the air these wires were not visible. But everybody knows from the ground they're perfectly visible. The argument was. That's a duty question, right? It is, and that is. We're talking about contributory negligence, right? And so the contributory negligence question, it just comes from different sides of the angle, right? Two sides of the same coin, Your Honor. Maybe it's not the same coin, right? It's definitely two different sides. The coins might look a little different, right? Because the contributory negligence question comes from the perspective of the pilot, right? And so asking whether it's visible from the air seems like the right question and the contributory question, maybe not the duty question. With all due respect, I submit that's not the question. Our argument is, the question is, was the pilot aware of the hazard of the pole that was 32 feet high in the field? And he was. And from that, was he required to then surmise that there must be a wire? He must, under all guidance, FAA, he should eliminate the possibility that there's a wire. Because all of that guidance says, if there's a pole, assume there's a wire unless you can establish otherwise. He didn't. And here's how he didn't. Because also the guidance says, in the North Carolina. You're still on the contributory negligence point here. Right. Right, I am. The guidance. I have to come back to the foreseeable duty defendants. I'm glad to do that. I also want to remind us that we're in North Carolina. And the North Carolina Supreme Court has said repeatedly and unequivocally that it is in exceptional negligence cases that summary judgment is appropriate. So explain to us why this is an exceptional case where summary judgment is appropriate in a negligence case where North Carolina Supreme Court has said repeatedly only in extraordinary circumstances is summary judgment appropriate. We're going back to the duty question at this point. This is an exceptional case because it's the unique circumstance where the farmers had no way of knowing without having the expertise of pilots that what was obvious to them was not also obvious to the pilot. Duty, if there are no disputed facts, duty is a question of law. And the district court recognized that. And the district court recognized that on this evidence, on this record, there is not a fair inference to go to a jury because there are no disputes about what the facts are. There is a dispute about whether the reasonable farmer would know that this was a hazard. And that's a factual dispute. Well, I think that is a mixed fact and law question. But it's a conclusion from what are known as the undisputed facts. The facts about who knew what, who did what, when, all, none of that is in dispute. If we were to ask what is the fact that's in dispute, the only fact is whether there was or wasn't not foreseeability. And that makes it a pure question of law if the reasonable inferences cannot be placed in favor. We have to draw all inferences in favor of the nonmoving. Absolutely. Absolutely, you have to do that. The claims here, though, seem to be, I don't want to not characterize their argument correctly, but they seem to make an argument that lawyers might call a pattern in practice. The defendants knew from prior crop dusting experience that there would be aerial hazards that would not be ground-based hazards. And that that creates a jury question in this case. They argue that, but there are no facts to support that they were aware that there is a difference between a ground hazard and an aerial hazard. They argue we saw crop dusting take place in the past. But there is no evidence that we were aware of a hazard. And these fields have been crop dusted for years, and there was never Do you have to have evidence that a wire is a hazard to a helicopter? It strikes me that that's not one of those things that requires evidence, right? That we can envision a reasonable person recognizing that a wire and rotary blades don't mix well. That doesn't require evidence, right? That's the inference. But the duty is to warn of a hazard that is hidden or concealed. Totally get that, but that's a different point than the one you were trying to make. But to the farmers, what's the evidence that the farmers knew that the wires and the pole were hidden hazards? That's the rub. Okay, so you agree that if they knew it was hidden, that they understood that this was an aeronautical risk. That it was an aeronautical hazard if it was hidden. You agree that they understood that a helicopter and a wire don't mix. I don't know that they ever thought of that, Your Honor. I don't know that I can concede a fact like that. Okay, that's what I thought you. I think you're making both arguments, but when I asked you about one question, you answered with the other, right? Well, I'm sorry. I apologize for that. My question is, why do you think it's beyond argument that the farmers here could not have foreseen that a wire would be a danger to a crop dusting helicopter or maybe a fixed wing? Is it only because it's hidden, or is there another reason you think they were not foreseeing that risk? I think the duty only applies, Your Honor, to warn if one has reason to believe that it is a hidden or concealed danger. I think they could have imagined, well, if a helicopter hits. Hypothetically, and this is not the facts of this case, but hypothetically imagine that your clients had written emails and testified on the Bible that they knew the wire was hidden, right? So we know from previous facts that they knew the wire was hidden. Do you agree in that scenario that they would have had to provide a warning to the helicopter pilot? I do.  I do. We submit there is no inference from these facts that they knew the wire was hidden. And I think that a really interesting thing is Didn't one of the defendants testify that they had seen crop dusting fixed wing aircraft fly over a field and they were so low that the under structure had beams on it? That's true. That's true. And we accept the inferences of that. But that doesn't create the inference that they knew that the wire and the pole were a hidden danger that required a warning. They must know that it's a hidden or concealed danger to have a duty under North Carolina law. And it doesn't help. And your view is the only inference we can draw from the record is that they had no idea that somebody wouldn't be able to see that wire. And that you're that they had no idea that somebody visiting that area in a airplane would not be able to see the wire. I don't think there's any evidence that creates a fair inference that that's the case. We submit that's what your case rises and falls on that idea. Well, I think yes, in a sense, because the duty under North Carolina law is to warn of a hidden or concealed danger. Had they been told by the helicopter pilot, hey, are there any wires on this field? Because you know what? I can't see them from the air like you can see them from the ground. We'd have a different case. We'd have a different case. But because the law is what the law is, we submit there's no reasonable inference from any of this evidence that they appreciated or had reason to appreciate that these wires obvious to them, this wire and this pole obvious to them was not equally obvious to anybody else using that. And of course. Can I ask just a clarification? I think it's a clarification question. Okay. In theory, Rayburn, who was the farm owner, could argue that he it was not foreseeable to him that crop dusting would take place. For sure. Have you is that the argument that you've made? I mean, our focus has not been on that question. Your briefing seems to combine Rayburn and the farm. And I didn't see sort of the separate argument that Rayburn could not. You know, there are two steps, right? You have to anticipate that there's a crop dusting going on, and then you have to anticipate that the wire is a hidden danger. I understand the second argument. We've talked a lot about that. I didn't understand you to be making or have made the separate argument that Rayburn, unlike the farmers, who obviously knew that crop dusting was taking place, that he could not have foreseen that crop dusting was taking place. Well, we've made the argument in the brief, Your Honor. I haven't gotten to that here, but certainly that is the case. You think that that argument was made in the district court and was made in the briefing here? It was. It was made in the briefing because it was pointed out. He was retired. Do you happen to know where in the briefing you make that argument with respect to Rayburn? I wish I knew the briefing page numbers well enough, Your Honor. But that is an argument. He didn't even know there was crop dusting to take place. Moreover, he didn't, there's no evidence in the record that he had had any crop dusting done in that field at all. Under that division of argument, for instance, the estate of Rayburn Daw could be out under summary judgment, but Daw Farms and the other Daw defendants would stay in. If the court rejects my argument about the duty in terms of not being sufficient evidence that the farmers had reason to believe that a wire that was, a polling wire that was obvious to them was not obvious to others, and the court draws that distinction, I think the court could reach that conclusion. We submit that that open and that obvious nature covers all of the farmer defendants. I see my time is up. All right, thank you very much. Mr. Brock, we'll hear from Mr. Hogan now. Good morning. May it please the court. The claims against Nutrien Ag Solutions and its salesmen and crop consultant are even more tenuous than they are against the farmers. These are not landowners. These are not occupiers of land. They didn't control the land. And engaging in the mere undertaking of scheduling a crop dusting operation does not impose upon a crop consultant a duty to know what only a pilot will know. I understand the plaintiff's argument to be that there was evidence from different witnesses that the engagement of Nutrien was more extensive with that. And if that's the case, why wouldn't that be just a classic jury factual question? What was Nutrien and Elmore engaged to do? Sure. As the district court noted, they were engaged to schedule the crop dusting, they identified the fields, and they provided the chemical. That was the scope of the undertaking, and the scope of the undertaking determines the scope of the duty. Isn't that the extent of this undertaking? Right? I mean, you say, like, they only did these three things, right? But that's the entirety of that side of the undertaking, right? Sure. That's all that happened on that side. That's all that Mr. Elmore did on behalf of Nutrien, and all Nutrien did was really supply the chemical, right? The plaintiffs say that if on tradition and custom, for no other reason, there was more to it than that, that it would be a normal expectation in that trade, in that part of the country, that the supplier or the agent for the crop dusting services would undertake to do more than simply deliver the chemicals, and that it's a factual dispute as to what they agreed to do. Judge Agee, there is not a shred of evidence in the record that they agreed to do more than that, and the only thing that they cited was Expert Thomas's offhand comment that this was an industry standard. But there is zero evidence that any crop consultant ever provided helicopters with a briefing on what might be a hazard to them. And the reason for that is... But isn't there evidence that Critter actually asked Elmore right before he flew whether there was anything he needed to be aware of on the farm? He specifically asked that question? So the district court addresses this shred of evidence in footnote eight of its opinion, and this was not before he flew, this was after he had completed the spraying of numerous fields, and the district court rejected the notion that that call was about a hazard because there was a mountain of evidence that it had to do with other issues that the pilot should be aware of, like a subdivision that was on the north end of the field. Be careful, don't spray there because there's a risk of drift, right? And there's... That sounds like a fat question and an inference to me. Even if you accept that as a call midway through about a hazard, that doesn't change the analysis because there is no question that there is zero evidence that any of the defendants... Who told Critter about the subdivision? Does the record tell us who communicated with Critter about the subdivision and the possibility of drift, as you indicated? There was a text between Mr. Critter and Mr. Elmore about... That was Mr. Elmore? Yes, it was. But again, going back to the foreseeability, which is a critical component of looking at not just the scope of the undertaking, giving rise to a scope of duty, but what is foreseeable in discharging your undertaking. And there is no evidence in the record that Mr. Elmore appreciated that this wire would suddenly become invisible from a helicopter. Nobody knew that. If this case... If Mr. Wheeler from 2019, who had the close call, had called up Mr. Elmore and said, Hey, look, I almost hit this wire. It disappears when you're in the cockpit of a helicopter. I know you can see it from the ground, but you cannot see it when you're in a helicopter. We have a different case. That's a different story. That's actual knowledge. There's no evidence of that. But actual knowledge isn't required, right? Actual... For a premises liability claim, Mr. Elmore and Nutrien certainly have no obligation to inspect thousands and thousands of acres of farm that they organized to have a crop duster come and spray. I mean, that is not only physically impossible. I see my time is up, Mr. Agee. Judge Berner's question. Not only is that physically impossible for a crop consultant to inspect thousands of acres, but it's also impossible from a knowledge standpoint to impose upon a crop consultant to understand what constitutes a hazard to a pilot in a highly regulated and specialized industry. Foisting that kind of duty upon a crop consultant would do away with this sort of crop dusting service that they provide to farmers to allow them to complete their jobs. All right. Thank you very much. Thank you. We'll now hear Mr. Chilson's rebuttal. Ma'am, police court, I'd like to start with Delanar Dawes' duty. There's an interesting passage in John Anderson's deposition where Mr. Anderson got lost on the way to the staging area for the spraying of this particular field. The testimony is that he was about two miles from the site going in the wrong direction when he ran into an older fellow that he was told later was Mr. Dawes. Mr. Dawes said, I know who you are. You need to go back that way and then gave him instructions back there. We believe, or a jury could believe, that that was Delanar Dawes because Rayburn Dawes did not testify that he had ever encountered any of the critter folks. That exchange, that dialogue can be found in the joint appendix on pages 294, 295, 297 through 299. I think one of the things that tends to get lost in this case. There's a lot of Dawes in this case. That's one of the Dawes of the Daw Farms. That's the Mr. Daw who owned the field, who erected the pole and the wire. So you're saying that there's deposition testimony that he told the critter's crew member to go back the other way? Yes, Your Honor, and what it does is it allows a jury to make a reasonable inference that that Mr. Daw, the landowner, was aware that the crop dusters were present that day to spray the fields and where they were spraying because he directed them back towards the potato barn, which is very close to his field. One of the things that I think gets missed in this case is that, I'm sorry, just maybe I've got, I confess, maybe I just have them confused. The person who owned this field, his first name was what? Rayburn. Okay. Did I miss, I apologize. No, I confess. I have the same problem, Your Honor, I'm sorry. Okay, and so tell me what, Delanor Daw, he owns the farm company? Yes, and he owns the field next to it, yes, where Jordan Elmore was riding on a combine when he saw the wire. All right, I think I understand. So tell me why this, why it matters that Delanor Daw knew that the crop duster was coming? Well, why is that? You chose to lead off with that. I'm trying to figure out why that matters. Well, I was responding to the argument that seemed to be that because Delanor didn't know about this spray operation, that he, therefore, may not have had, it may not have been reasonably foreseeable to him that a crop duster would be present. Well, but everybody knows that the farm knew about this. The question is whether Rayburn knew about it. Yes, Your Honor, and if he told Mr. Critter's crew. But not Rayburn, you just said Delanor. Murray is how I refer to him. I guess that's the confusion. The owner of the field. The owner of the company has not testified that he had any interaction with any of the Critter folks. So the Daw, Mr. Daw, who did have an interaction, a reasonable jury could infer that it was the owner of the field. Murray Rayburn. Yes. Yes, Your Honor. There was no lease agreement between the parties, is that right? It was an oral agreement, that's right. And what does North Carolina law say about that? It's still a valid lease as long as the terms are complied with. But Mr. Rayburn maintained access to the property and used it from time to time. He sure did, Your Honor. There was a lock and key that he maintained control to, and there's testimony in the case in the record that he was very particular about who had access to his fields. So both Mr. Rayburn and Daw Farms had access to the property and used the property in this time period. That's right. So if we were to find a duty of care, it would be to both? Yes, because it's a non-delegable duty, and that's one of the things in this case is that they seem to be wanting to delegate the duty to inspect, the duty to supervise, the duty to keep the premises clear to the lawful visitor, Mr. Critter. Premises liability law in North Carolina is clear that the duty is non-delegable for the landowner and the land occupier in this case. And there are other duties. It's not just to warn. The duty is to keep safe, to take reasonable efforts to keep the property safe from hazards to lawful visitors. And within it, there's also a duty to behave reasonably, which would include removing hazards and to mark or warn of those hazards if they can't be removed. So can you go back and recap? What exactly is the jury question when it comes to the Nutrien defendants? Yes, Your Honor, and I am out of time. Okay. So the jury question regarding the Nutrien defendants and Mr. Illmore is that based on the evidence in the record that Nutrien oftentimes arranged for crop dusting services as a service that went along with their sale of their chemicals to their customers. And because pilots in the case have testified in the record that oftentimes they only meet with a representative from Nutrien as opposed to an owner or an occupier of the grounds. And because that facility, I'm sorry, that discussion often involves safety. And because they expect, these non-party witnesses expect, that the Nutrien representative from their custom and their experience will warn of hidden dangers in the fields. That is a jury question, whether or not they had a duty and breached that duty to Mr. Crear. So in effect, the jury question is, was there a, since there is no written contract, was there effectively a custom and practice in that trade to undertake to do more things than simply deliver the chemicals? Yes, Your Honor. Okay. Thank you very much. Thank you. Yeah. We're going to come down and recancel and move on to our next case.
judges: G. Steven Agee, Julius N. Richardson, Nicole G. Berner